**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA**


**-vs-**                                                    **Case No.  6:98-cr-52-Orl-19JGG**

**WILLIAM J. MCCORKLE and CHANTAL**
**MCCORKLE**

                    **Defendants.**


_____

# ORDER

### _Procedural History and Supplemental Sentencing Hearing_

This case was remanded to the court for re-sentencing pursuant to an opinion of the

Eleventh Circuit Court of Appeals.  (Doc. No. 1205).  The Court of Appeals stated in part:

> Here, both constitutional and statutory error occurred.  The district court sentenced both
> appellants using a mandatory guidelines scheme and enhanced their sentences based on facts
> they neither admitted nor the jury found.  Moreover, the court repeatedly expressed
> misgivings about the severity of the sentences it was handing down.  In sum, with respect to
> the constitutional error, the Government has failed to show beyond a reasonable doubt that
> the error was harmless, and with respect to the statutory error, it fails to meet _Mathenia's_ test.

_United States v. McCorkle_, 141 Fed. Appx. 860, 862 (11th Cir. July 22, 2005).

Subsequently a sentencing hearing was held on October 7, 2005, and was attended by

Defendants William J. McCorkle and Chantal McCorkle, their respective attorneys, and attorneys

for the Government.  At such hearing the Court heard argument of counsel, statements from both

Defendants, and a proffer of evidence.  The Court reviewed the sentencing memoranda filed by

-1-

William J. McCorkle at Docket Number 1206 and by Chantal McCorkle at Docket Numbers 1207

and 1208.   After the conclusion of the hearing, the parties filed supplemental sentencing

memoranda which the Court has also reviewed.  (Doc. No. 1215, 1216, and 1220).  Defendants

have each adopted the arguments and memoranda of the other.

At the inception of the hearing held on October 7, 2005, the Court announced to the

parties and their counsel that, after review of the file, the previous findings of fact and rulings of

law it had made, based on the sentencing guidelines which are now deemed advisory, were

correct.  Thereafter, the Court solicited guidance from counsel and the Defendants as to their

views on how and why the sentences of Defendants should be changed, if at all.

Counsel for Mr. McCorkle argued that a sentence of 10 years in prison followed by 3

years of supervised release would be a reasonable sentence and not greater than necessary to

comply with the purposes set forth in 18 U.S.C. Section 3553.  He argued that the victims of the

crimes had received restitution, that Defendant was a first time offender and had been a model

inmate for seven years, receiving a Doctor of Ministry degree while incarcerated.  He contended

that Defendant was rehabilitated and no longer a danger to society.  Counsel for Mr. McCorkle

argued that Defendant has changed and grown during the seven years he has been incarcerated.

He was in his early twenties when he started the business that resulted in his indictment; he is

now close to 40 years of age.  He has educated himself, and counsel represented that Mr.

McCorkle is a good human being.

On Mr. McCorkle's behalf counsel contended that if there was ambiguity in the law of

resentencing, it must be resolved in favor of Defendant under the "rule of lenity," that any conflict

between the sentencing guidelines and Section 3553(a) should be determined under the rule of

lenity, and that 10 years in prison was sufficient to reflect the seriousness of the offense, promote

respect for the law, provide just punishment, protect the public and provide deterrence.  Counsel

for Mr. McCorkle stated that taxpayers in this case had suffered no loss as there had been seven

million dollars in assets forfeited to the Government.  Further he contended that everyone who

had made a timely claim received restitution, and because only a "handful" of victims lost several

thousand dollars[1] and the majority of claims were for $69.00, a twenty-four year sentence for a

person who lost $69.00 is too long.

Mr. McCorkle's counsel argued that the sentence imposed was clearly excessive when

compared to the sentences imposed on other notable white collar convicted defendants in other

high profile cases that resulted in greater monetary loss than that present in the instant case.

Further, in rebuttal he pointed out that the prosecutor had asked for the low end of the guidelines

at the original sentencing, which counsel described as unusual and should lead to an inference

that the prosecutor also felt the sentence was too severe.[2]

Mr. McCorkle personally addressed the Court.  He acknowledged that events described at

trial were his responsibility but that he had lost everything.  During the time he has been in

prison, he stated that he had rethought his life and turned in another direction.  He represented

that he was a different person, was productive, and deserved a second chance.  He contended that

---

[1]Contained in Exhibit 1 to Mr. McCorkle's Sentencing Memorandum (Doc. No. 1206) is a copy of a state court order dated August 15, 2000 approving and accepting claims that alone reflects over 500 victims asserted claims of $1000.00 or more to the state in the period covered by the order.

[2]The original lead prosecutor on the case, Mr. Paul Byron, is no longer with the Office of the United States Attorney.

he was no longer a threat to the community.[3]

Counsel for Ms. McCorkle argued that Defendant had received a four point increase in her advisory guideline range erroneously because that scoring pertained to money laundering and there was no organization in the money laundering.[4]  Counsel for Ms. McCorkle also argued that a sentence of 10 years imprisonment would be sufficient but not greater than necessary, would reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from further crimes.  Ms. McCorkle contended that not only did anyone who timely filed a request for a refund receive it, so there was no need for restitution, but also that the product sold had value, so the loss was overstated.   Therefore, she argued, the loss valuation in the Amended Presentence Report was overstated.  Further, she emphasized that the case had generated international attention, including a motion passed in the British Parliament and a letter from a member of Parliament expressing the view that the sentence was too severe.[5]  Counsel for Ms. McCorkle argued that public opinion did not support the sentence and supplied letters from many parts of the world in which the authors expressed the view that the sentence was too severe.  On Ms. McCorkles' behalf counsel asserted that her finances were in complete ruin and that a study had shown that a fine in a white collar crime case

---

[3]A letter from Mr. McCorkle's counsel, William Mallory Kent, supported Defendant's contentions.

[4]To the extent that this was an objection to the scoring for Ms. McCorkle's advisory guideline range, as noted above the Court adopted its previous findings in the original sentencing proceeding as amended on the earlier remand from the appellate court.  The money laundering, in which both Defendants engaged, was extensive and over a long period of time.  Further, the money laundering was part of a fraud as to which Ms. McCorkle was an organizer or leader of five or more people.

[5]Ms. McCorkle is a British citizen.

had more deterrent effect that imprisonment.[6]

Counsel for Ms. McCorkle referenced that she had taken advantage of educational offerings while incarcerated, as shown by the certificates attached to her memorandum of law, and stated that there was no need for her to stay in prison any longer to provide needed educational or vocational training, medical care, or other correctional treatment.  Ms. McCorkle has not been a discipline problem in prison.  Further, Ms. McCorkle is not eligible to go to a camp-type prison or on furlough because she is not a citizen of the United States of America. Therefore, counsel stated that Ms. McCorkle requests that a period of supervised release be fashioned so that she may return to the United Kingdom and not return to the United States.  He advised that Ms. McCorkle would not contest deportation.

Counsel for Ms. McCorkle read a letter from Defendant's stepfather, Mr. Forrester, and Defendant Chantal McCorkle personally addressed the Court.  She asked for forgiveness, stating that she would like to have children but could not if she had to stay in prison for the sentence that had been imposed. She stated that she was lonely and unable to see her family from the United Kingdom while she is in prison in the United States.

### *Analysis*

In imposing a sentence, the Court must consider a variety of factors, some of which are enumerated in the advisory guidelines and in the statutes.  In particular, Title 18 U.S.C. Section 3553(a) provides that the Court should impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in such statute and should consider certain

---

[6]Since both defendants claim to have no assets, a fine imposed upon them commensurate with the advisory guideline range would not appear to have any deterrent effect or likelihood of being paid in the near future.

enumerated factors.  Generally, a sentence within the applicable advisory guideline range is a sentence that comports with this provision.  *See, e.g., United States v. Wright*, 895 F.2d 718, 720 (11th Cir. 1990).

The nature and circumstances of the offense and the history and characteristics of the Defendant, 18 U.S.C. Section 3553(a)(1), are well described in the Presentence Reports of the Defendants and augmented by the written and oral presentations in the case as well as the evidence at trial.  The Presentence Report of Mr. McCorkle delineates the offense charges and convictions (para. 1-3), offense conduct (para. 4-56); amount of loss [7](para. 56); custody status (para. 57); victim impact (para. 58); obstruction of justice[8] (para. 59); and acceptance of responsibility[9] (para. 60).  The Presentence Report describes the advisory offense level computation (para. 61-83) and Defendant's criminal history (para. 84-87)[10].  His offender characteristics are related with personal and family data (para. 88-91); physical condition[11] (para.

---

[7]The Presentence Report for Mr. McCorkle states in Paragraph 56 that $40 million was generated in sales from the Defendants' fraud, and $26 million was the value of the laundered funds.

[8]The Presentence Report describes the obstruction of justice which stemmed from an affidavit executed by Ms. McCorkle and provided to the Court in which she lied about funds available to her and Mr. McCorkle.  This affidavit was submitted to the Court on behalf of both Defendants.

[9]Mr. McCorkle did not accept responsibility for his acts at the time of the initial sentencing.

[10]  Mr. McCorkle has two counts of driving with a suspended license and one count of speeding as well as a conviction for an election code violation on his record for which no points were scored in the advisory guideline computation.

[11]Mr. McCorkle is reported to be healthy.

-6-

92); his mental and emotional health[12] (para. 93); substance abuse[13] (para. 94); his education and training[14] (para. 95); his employment[15] (para. 96-97); his financial condition[16] (para. 98-100); and his ability to pay a fine[17] (para. 100).  The Presentence Report does not list military service for Mr. McCorkle.  In addition at the October 2005 sentencing hearing, Mr. McCorkle presented an impressive series of accomplishments achieved while he has been in prison[18] as well as testimony, which the Court has considered.  He appears to have found direction for his life.  He represented to the Court that he had been a model prisoner, and in support of his request for a lower sentence he supplied character letters and recommendations from family and friends, persons in the Bureau of Prisons and in the business community, and religious affiliates.

The Presentence Report of Defendant Chantal McCorkle describes the charges and convictions (para. 1-4); the offense conduct (para. 5-57); amount of loss (para. 57)[19]; custody status (para. 58);

---

[12]No mental or emotional problems were reported.

[13]No substance abuse was reported.

[14]Mr. McCorkle graduated from Bishop Moore High School in 1984.

[15]Mr. McCorkle has been employed variously in the real estate and mortgage broker business and has worked as a busboy.

[16]Mr. McCorkle represents that he is indigent.

[17]No fine was assessed, although the Presentence Report related that Defendant might have the ability to pay a fine at the low end of the fine range, in addition to restitution.

[18]Transcripts and diplomas from Logos Christian College and Graduate School reflecting that Mr. McCorkle has received a Doctor of Ministry degree, certificates of Bureau of Prison courses, completed certificates of training in suicide prevention and inmate companion for suicide prevention as well as certificates of appreciation for Mr. McCorkle's work in prison were presented to the Court.  (Doc. No. 1206, Exhibits 3-6.)

[19]See footnote 7 above and paragraphs 57 and 67 and page 30a of Ms. McCorkle's Presentence Report.

victim impact (para 59); obstruction of justice (para 60)[20]; acceptance of responsibility (para.61-63)[21]; and the advisory offense level computation (para.64-87).  Further, the Presentence Report presents the absence of a criminal history of Ms. McCorkle (para.88-90) and her offender characteristics including personal and family data (para. 91-100); physical condition (para. 101)[22]; mental and emotional health (para. 102)[23]; substance use (para 103)[24]; education and training (para. 104)[25]; employment (para. 107-

---

[20]See footnote 8 above.

[21]Ms. McCorkle essentially asserted that she assisted her husband, believed the products he sold were legitimate and worthwhile, held stock in her husband's corporations because he felt it would be more appropriate in light of his previous bankruptcy, and that she was involved in the checking account activity and supervision of the bookkeeper, not in the sales or marketing of the product.  She contended that her affidavit to the Court was not false.  Her position throughout this case has been that she was an innocent, dutiful wife.  See Presentence Report of Chantal McCorkle, paragraphs 61-63. At the October 2005 hearing, her counsel contended that Mr. McCorkle had controlled Ms. McCorkle, that the idea for the product was that of her former husband, and that Ms. McCorkle did not have the ability to commit the fraud by herself.  While the latter argument may be correct to the extent that the crimes were perpetrated on a scale that required the assistance of other persons, these arguments do not comport with the evidence at trial.  The record reflects that Ms. McCorkle was very much at the center of the fraud, money laundering, and other crimes of conviction and that she exercised a leadership role in such crimes.  Further, it was she who executed an affidavit, knowing it would be presented to the Court, in which she knowingly lied about a material fact, the financial situation of herself and her then husband, Mr. McCorkle.

[22]Ms. McCorkle has no history of hospitalization or serious illness.

[23]Ms. McCorkle has no history of mental or emotional problems with the exception of depression at the time of her father's suicide for which she had four short counseling sessions to help her work though his death.

[24] No use of illegal substances was reported.

[25]Ms. McCorkle graduated from a catering college in England.

-8-

109)[26]; and her ability to pay a fine (para. 109)[27].  The Presentence Report does not list military experience for Ms. McCorkle.  In addition at the October 2005 sentencing hearing, Ms. McCorkle presented  a lengthy index and copies of certificates of courses she has completed while in prison, including but not limited to the Battle of the Bulge Program; Keeping the Bond "Strengthening Family Ties"; Spiritual Counseling; Outstanding Effort, Dedication, and Participation in the Aerobic Class; Parenting on the Computer; Suicide Watch Observation Training and Dedicated Services as a Suicide Cadre Member; Personal Power Training; Professional Fitness Program (in which she earned a grade of 98 or A plus); Living Free Program; Career Center Resume Class; In Sight Seminar; Suicide Prevention as a member of the Inmate Companion Team;  and an Associate of Biblical Studies degree from Logos Christian College. (Doc. No. 1207, Exhibit 3).  The report she submitted from FCI Dublin states that she has maintained clear conduct during her incarceration.  *Id.*

Title 18 U.S.C. Section 3553(a)(2) requires the Court to consider the need for the sentence imposed:

     (A)     to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

     (B)     to afford adequate deterrence to criminal conduct;

     (C)     to protect the public from further crimes of the defendant; and

     (D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

In this case, there is no evident need to provide either Defendant with educational or vocational

---

[26]Ms. McCorkle was an officer in several of the corporations involved in the instant case. It is also reported that she worked during summers for a local grocery store in England and worked as a cook in the United States and took care of children.

[27]The Presentence Report stated that until the forfeiture issue was resolved, Defendant might have the ability to pay a fine at the low end of the fine range in addition to restitution. It appears that he forfeiture issue has been resolved, and it does not appear that either Defendant has the ability to pay a fine.

training, medical care or other correctional treatment.  Generally a sentence within the applicable

advisory guideline range fulfills the requirements of Section 3553(a)(2)(A), (B), and (C).  *See Wright*,

895 F.2d at 720 ("Sentences falling within the guideline range may not be complained of on appeal,

even if arguably unreasonable under the facts of a given case, unless the sentence was imposed in

violation of law, was based on a misapplication of the guidelines, or was plainly unreasonable and

imposed for an offense for which there was no applicable guideline."); *see also United States v.*

*Ameline*, 409 F.3d 1073, 1098 (9th Cir. 2005) (explaining that *Booker* restored the "complete discretion

of sentencing judges to sentence anywhere within the statutory range, so long as the sentence is

tethered to the congressional goals of sentencing set forth in 18 U.S.C. § 3553(a).").

Section 3553(a) also requires the Court to consider:

(3)     the kinds of sentences available;
(4)     the kinds of sentence and the sentencing range established for the applicable
        category of offense committed by the applicable category of defendant as set forth in the
        applicable guidelines subject to amendments of Congress; and
(5)     Any pertinent policy statement issued by the Sentencing Commission and Acts
        of Congress, including those amending such policy statement.

18 U.S.C. §§ 3553(a)(2)(A)(3)-(5).

Mr. McCorkle's Presentence Report describes the sentencing options (para. 101-127), including

the advisory guideline range (para. 104).[28]  Ms. McCorkle's Presentence Report describes the

sentencing options (para. 110-138)[29] and her advisory guideline range (para. 113).  Defendants were

---

[28]The advisory guideline range is Total Offense Level 40, Criminal History Category I
which provides for 292 to 365 months of imprisonment (24 years, 4 months to 30 years, 5
months).  Defendant William J. McCorkle was convicted of 81 felony counts, and if he had been
sentenced consecutively under the applicable statutes, he would have faced a maximum of 1,025
years in prison.

[29]The advisory guideline range is Total Offense Level 40, Criminal History Category I,
which provides for 292-365 months of imprisonment (24 years, 4 months to 30 years, 5 months).

sentenced under the 1995 version of the sentencing guidelines. [30]

Additionally, the statute directs the Court to consider the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, 18 U.S.C. Section 3553(a)(6), and the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a)(7).

Taking the seventh factor first, the parties acknowledge that the state and federal governments developed a procedure to attempt to repay victims of Defendants' crimes. Some 2,529 claims of victims have been paid through property seized from Defendants. Neither Defendant has been shown to have made a single payment himself or herself to any victim of the crimes of conviction after the verdict. There is no contention that either Mr. or Mrs. McCorkle currently has funds with which to repay the other victims as substantially all of Defendants' assets were seized and made subject to forfeiture. The state and federal governments paid claims of those victims who were able to show proof of purchase and who timely filed a claim form.[31] This procedure did not result in repayment of all the victims of Defendants' crimes. Defendants' argument that all victims have been made whole and that the taxpayers have received a windfall from the amount of Defendants' assets that have been

Ms. McCorkle was convicted of 69 felony counts, and if she had been sentenced consecutively under the applicable statutes, she would have faced a maximum of 960 years in prison.

[30]The probation officer reported to the Court in a memorandum dated September 4, 2003, which was also sent to counsel, that the adjusted offense level under the Guidelines Manual then in effect, if applied, would place Defendants in an adjusted offense level of 48 instead of 40.

[31]At the October 7, 2005 hearing, counsel for the Government advised the Court that not all claims of purported victims of Defendants' crimes were paid, and there were other victims who did not make claims or made claims for reimbursement that were untimely. Doc. No. 1214, pp. 78-81. The number of victims who were not reimbursed was not presented to the Court, although it was represented that 2,529 claims of victims were paid. *Id.*

forfeited is disingenuous.  No efforts of Defendants were involved in the restitution program, and the inability of the state and federal governments to locate all victims of Defendants' crimes is due in part to the way records were kept, or not kept, by Defendants themselves.   The fact that the Government forfeited some of the funds generated from Defendants' crimes is not reason to lessen the sentence imposed, particularly where forfeiture is mandatory under the law.  Further the argument that the product sold by Defendants had value does not "ring true."  Defendants lied to and cheated their victims, and the evidence at the trial showed that any value of the products they provided was both fortuitous and an unintended result of their frauds.

As to factor six, the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, Defendants have filed pleadings and copies of sentencing judgments from several cases, many of which garnered national publicity, essentially arguing that the frauds in those cases involved larger amounts of losses and the defendants in those cases received lesser sentences than did Defendants in the instant case.  Not only are there important gaps in the facts from the record provided to the Court, but also the pleadings and judgments reflect that these cases are distinguishable.[32]

Defendant William J. McCorkle was found guilty after a jury trial of one count of conspiracy to commit mail fraud and wire fraud, eleven counts of mail fraud, one count of conspiracy to commit money laundering, sixty-two counts of money laundering under various statutes, three counts of conspiracy to commit credit card fraud, and three counts of fraudulent use of a social security account

_____

[32]The Seventh Circuit Court of Appeals noted in *U.S. v. Newsom* that it is not sufficient to argue that a few cases seem to case doubt on a particular sentence.   In addition to knowing the crime of conviction and total length of sentence, the specific facts of the crimes and the defendants' individual characteristics are also important to evaluating disparities. 428 F.3d 685, 689 (7th Cir. 2005).

number.  Defendant Chantal McCorkle was found guilty after a jury trial of one count of conspiracy to commit mail fraud and wire fraud, one count of conspiracy to commit money laundering, sixty-one counts of money laundering, two counts of conspiracy to commit credit card fraud, two counts of fraudulent use of a social security account number, and one count of making a false declaration before a Court.  Defendants participated in a criminal conspiracy, the intended loss of which was more than $20,000,000.00 but not more than $40,000,000.00.  The value of the funds laundered was just under $40,000,000.00.  Defendants were organizers or leaders of criminal activity that from the evidence was extensive and involved more than five participants, and the offenses involved more than minimal planning and a scheme to defraud more than one victim.  Further, the McCorkles willfully obstructed or attempted to obstruct the administration of justice during the investigation and prosecution of this case by knowingly providing materially false information to the United States Magistrate Judge and by concealing evidence that was material to an official investigation.  At the original sentencing, neither Defendant demonstrated recognition and affirmative acceptance of personal responsibility for the offenses.

In contrast, *New York  vs. Kozlowski and Swartz* involved Tyco International Ltd., its predecessor and subsidiaries, a global company alleged to employ over 270,000 people with $36 billion in annual revenues.  (Doc. No. 1215, Ex. A).  This state court case involved primarily charges of violations of state laws and acts of securities and corporate frauds including but not limited to thefts, manipulating the corporation to defraud shareholders and regulators, and compensation improprieties.  It does not appear from the record submitted if state sentencing guidelines were consulted in fashioning the sentence.  (*Id*. at Ex. B).[33]  There were far fewer counts of conviction in the Tyco case than in the

---

[33]This case was also presented as Exhibit 6 to Docket Number 1216.

instant case and the charges were different.  Also unlike the case at bar, in the Tyco case there were no charges of money laundering or submitting a false affidavit to a judicial officer, and a significant amount of restitution was ordered.

In the indictment filed in the Southern District of New York in *United States v. Ebbers*, the charges involved one count of conspiracy to commit securities fraud in the purchase and sale of securities issued by WorldCom, Inc., one count of securities fraud, and seven counts of false filings with the Securities and Exchange Commission.  (*Id*. at Ex. C).[34]  The Judgment in a Criminal Case imposed in 2005 reflects that Mr. Ebbers was convicted on all 9 counts, and the sentence was imposed pursuant to the Sentencing Reform Act of 1984.  (*Id*. at Ex. E).  The factors that went into this computation and the advisory guideline range are not disclosed.  The Court notes that Mr. Ebbers was sentenced to twenty-five (25) years or 300 months in prison which is a longer sentence than that given to either Defendant in the instant case.

In another case from the Southern District of New York submitted by Defendants, the United States charged John Rigas, members of the Rigas family, and others with crimes ranging from one count of conspiracy to commit securities fraud, wire fraud, false statements in SEC filings, false books and records, and bank fraud, to sixteen counts of securities fraud, five counts of wire fraud, and two counts of bank fraud relating to Adelphia Communications Corporation, a cable television provider.  (Doc. No. 1215, Ex. F).[35]  The case involved allegations of such things as fraudulent leveraging and loans and manipulations in the acquisition of an airport and golf course, among others.  John Rigas was found guilty of twenty-four counts of the indictment and not guilty of five counts after trial. He was

---

[34]This case was also presented as Exhibit 7 to Docket Number 1216.

[35]This case was also presented as Exhibit 2 to Docket Number 1216.

sentenced on June 20, 2005 to 15 years in prison. (*Id.*) The Judgment in a Criminal Case reflects that the sentence was imposed pursuant to the Sentencing Reform Act of 1984, but there is no guideline range or other computation evident from Defendants' submission. However, the Judgment states that the Court recommended that the defendant be incarcerated in a facility which could deal with his medical needs, bladder cancer and other ailments, and notified the Bureau of Prisons that the Court would be willing to give sympathetic consideration to a motion for reduction based on extraordinary and compelling reasons after defendant served at least two years of the sentence if defendant was then in a terminal condition, i.e. had a life expectancy of less than three months. The Judgment also stated that defendant must pay restitution in accordance with a Court authorized Settlement Agreement, but the terms of this document are not disclosed or filed with this Court.

In *United States v. Boelens*, filed in the Middle District of Florida, Tampa Division, in 2002, Martin W. Boelens, Jr. was charged by information with one count of conspiracy to commit securities fraud, mail fraud and wire fraud, one count of securities fraud, one count of mail fraud and one count of wire fraud relating to the purchase and sale of securities, a Ponzi-type scheme involving bond debt instruments of Evergreen Security, Ltd. and a loss to victims in the amount of $78,000,000.00. (Doc. No. 1215, Ex. G). Mr. Boelens was sentenced, after pleading guilty to the four counts of the information and no trial, to 46 months in prison and required to provide restitution of $70,135,541.00. (*Id*. at Ex. H). The Judgment in a Criminal Case recites that the sentence was imposed on October 5, 2005, pursuant to the Sentencing Reform Act of 1984, but no guideline range or sentencing factors are revealed.

Finally, in a superseding indictment filed in the Southern District of Texas, Andrew Fastow and others were charged with 109 counts of conspiracy, wire fraud, obstruction of justice, money

laundering, securities fraud, and filing false tax returns incident to Enron Corp., a publicly traded company. (Doc. No. 1216, Ex. 4). In his plea agreement, Mr. Fastow agreed to plead guilty to one count of conspiracy to commit wire fraud and one count of conspiracy to commit wire and securities fraud. (*Id*. at Ex. 5). In Exhibit A to the plea agreement, Fastow admitted, *inter alia*, that he and other members of Enron's senior management fraudulently manipulated Enron's publicly reported financial results to inflate the company's stock and maintain fraudulently its credit rating, and that he engaged in transactions to enrich himself and others in violation of his duties to Enron's shareholders. (*Id*.)

Clearly these cases do not provide a basis for departure from the advisory guidelines in the instant case. Not only were the charges in them largely different from those brought in the case at bar, but also the schemes to defraud themselves were different from the schemes in the instant case. Further, there is no basis to compare the records of the defendants in those cases with the records of Defendants in this case. In addition, two of the cases involve entry of pleas of guilty without a trial, unlike the instant case. One is a state court case, not a federal court case. And in the federal cases in which it is recited in the Judgment and Commitment Order that the Sentencing Reform Act of 1984 was applied, it must be inferred without further information to the contrary that the advisory sentencing guidelines were followed to reach the offense level and criminal history category that resulted in the sentence imposed.[36] This is the procedure that was followed in the instant case.

Finally, the amount of loss occasioned by Defendants' crimes is only one factor that is considered in the advisory sentencing guidelines. It is not the sole factor by which comparison is made with other cases to determine if sentences have resulted in unwarranted disparities. It has been noted

---

[36]However, the record submitted does not explain what the advisory guideline range in each case was.

by the Seventh Circuit Court of Appeals that Section 3553(a) does not bar all disparities in sentencing; its concern is only with unwarranted sentencing disparity. *U.S. v. Newsom*, 428 F.3d 685, 689 (7th Cir. 2005).  There is no unwarranted sentencing disparity shown in comparing the sentences of Defendants in the instant case with the sentences of defendants in the other cases submitted to the Court for consideration.

The Court may consider factors in addition to those enumerated in Title 18 U.S.C. Section 3553(a) in pronouncing sentence.  Defendants argue that public opinion is opposed to a sentence of the magnitude pronounced by the Court.  Many of the letters critical of the sentence supplied to the Court are from British residents, the country of citizenship of Chantal McCorkle.  While considered, the Court is unpersuaded that public opinion, whether or not predominately from another country, is a reliable criterion upon which to base a sentence imposed in the United States of America.  Such consideration would leave the law in a state of uncertainty depending on the country or time of comparison, the popularity of the cause, the ability and financial means to communicate the issue and engender support, and other factors which are not rationally related to the purposes of sentencing.

The Court has searched for a way to reduce the sentences imposed in this case and at the same time remain faithful to the law.  The fraud in this case was pervasive.  The Defendants preyed on the public using infomercials broadcast around the country on television.  They lied to the public, to their employees, to their accountants, to the investigators, to the Internal Revenue Service, and to the Court. They also destroyed, concealed, or failed to maintain the books and records of their undertakings.  As a consequence, all of their victims could not be directly notified for the purpose of attempting to make restitution.  Their misrepresentations were made to conceal their frauds and to be able to continue and promote them and their money laundering activities.  From the testimony of the witnesses, hundreds

upon hundreds of unsuspecting people were victimized in order to raise millions upon millions of dollars for Defendants.  Any *de minimis* gloss applied by Defendants to their crimes of conviction is starkly refuted by the facts of record.

While Defendants were relatively young when they engaged in their criminal activity, they were old enough to know and appreciate the criminal nature of their acts.[37]  Defendants pursued and promoted their fraudulent schemes and money laundering with a vengeance, ensnared thousands of hapless victims in their net, figured out a way to conduct their crimes in the national arena, and spent their ill-gotten gains on themselves or to perpetuate their crimes.  Their argument that their victims have been made whole and that the taxpayers have received a windfall, through no effort of their own, reflects a callous attitude to the harm they have caused.

At the initial sentencing proceeding, the Court expressed concern about the length of the sentences in this case.  This case was at that time one of the first multi-defendant massive fraud and money laundering cases that the undersigned Judge had tried.  Since that time, the Court has presided over other multi-defendant criminal cases involving millions of dollars of fraud and multiple victims, some involving money laundering as well.  The pervasiveness of serious, criminal frauds perpetrated on unsuspecting victims in the American culture is illustrated not only by the instant case, but also by the several cases cited by Defendants as comparators.  There is good reason why punishment for extensive mail and wire frauds and conspiracies involving large amounts of money, numerous victims, more than minimal planning, and money laundering, credit card and social security fraud, as well as lying to a Court, such as the crimes perpetrated by these Defendants, involves a lengthy period of

---

[37]William McCorkle was born on June 1, 1966.  Chantal McCorkle was born on April 16, 1968.

-18-

incarceration.  Congress is rightfully concerned about protection of the public from persons who perpetuate these types of criminal activities.  While such crimes cause untold harm to the victims, they also work in a broader context to undermine the free market system and ultimately the institutions of democracy.

The Court has thought long and hard about the sentences imposed in this case.   While lengthy sentences, they are not disproportionate to the crimes of conviction.  The advisory guideline computations take into consideration the relevant factors, and following them insures that there will be no unwarranted disparity in sentences of similar persons similarly situated who are convicted of similar crimes. While it has considered all of the matters argued by Defendants, the Court can find no cogent reason in such arguments to reduce the sentence of either Defendant from the one calculated within the advisory sentencing guidelines.

However, as at the original sentencing, the Court feels that a sentence of twenty years in prison is sufficient under the facts of this case, but not greater than necessary, to comply with the statutes, policy statements, and purposes of sentencing.  Because of the way the Defendants kept, or failed to keep records, there is lingering concern that there were refunds made to dissatisfied customers of Defendants' scams prior to involvement by the governments, which refunds were not included in the loss calculation amount.  Once the Government successfully proved the amount of the loss or intended loss, the burden was on Defendants to prove the amount of any refunds made by them, as opposed to refunds made by the state or federal authorities.[38]  Defendants failed to carry that burden.  Therefore, while the recoupment amount is an unknown, it should bear some consideration in the sentencing as a

---

[38] *See*, *e.g., United States v. Dabbs*, 134 F.3d 1071, 1081-82 (11th Cir. 1998); *United States v. Craiglow*, — F.3d —, 2005 WL 3501332, at *4 (8th Cir. December 23, 2005).

matter of fairness.  Secondly, Defendants were sentenced on all Counts of conviction with the terms of

incarceration to run concurrently, except that the sentence of fifty-two months on Count 17 was made

to run consecutively.[39]  If the consecutive sentence on Count 17 were made to run concurrently, the

Defendants could be sentenced to twenty years of incarceration, a sentence which the Court feels is

more just.  Such sentence would reflect the seriousness of the offenses, promote respect for the law,

provide just punishment for the crimes of conviction, act as a deterrent to criminal conduct, protect the

public from further crimes of the defendants, would not result in an unwarranted sentence disparity

with sentences of like persons who committed similar crimes, and would not be unnecessarily lengthy

or punitive.  Whether by application of the "Rule of Lenity" or simply fairness, such sentence would

accomplish all of the goals of sentencing.  Such sentence would fall within an advisory guideline range

of Total Offense Level 38, Criminal History Category I ( 235-293 months), a reduction of two levels

from the guideline range that was applied.

### *Conclusion*

The Judgment and Commitment Orders for Defendant William McCorkle (see Docket Numbers

515, 533, 559, 1077, and 1085) and the Judgment and Commitment Orders for Defendant Chantal

McCorkle (see Docket Numbers 512, 532, 558, 1077, and 1085) will be amended to provide that the

sentences on all counts of conviction previously stated for each Defendant, including Count 17, shall be

served concurrently, for a total period of incarceration for each Defendant of 240 months.  In all other

---

[39]To come within the mandatory guideline range of Total Offense Level 40 Criminal
History Category I (292-365 months), the Court had to fashion a sentence that added the
necessary months to reach the bottom of the guideline range of 292 months.  It did so by making
the sentence of fifty-two months on Count 17 run concurrently to the sentences on the other
Counts.  Had the guidelines been advisory at the time of the initial sentencing, the Court could
have sentenced each Defendant to 20 years on Count 17 with such sentence running concurrently
with the sentences on the other Counts of conviction.

respects, including but not limited to the period of supervised release and the point within the advisory

guideline range selected for the sentence, the remaining provisions of the original Judgment and

Commitment Order as previously amended for each Defendant will remain in full force and effect and

unchanged.

The Court finds that this sentence imposed as to Defendant William McCorkle, individually,

and as to Chantal McCorkle, individually, meets the requirements of 18 U.S.C. Section 3553(a), *United*

*States v. Booker*, *United States v. Fanfan*, 125 S.Ct. 738 (2005), the Advisory Sentencing Guidelines,

and the policy and acts of Congress.  All of the factors considered alone and in combination do not

warrant a further reduction in sentence.

An additional sentencing hearing will not be held in this matter.[40]  Objections to this Order and

---

[40]Although a criminal defendant has the right to personally address the Court and to present mitigating evidence prior to the imposition of sentence, such defendant does not have the right to address the Court at any particular time in the sentencing process.  *See* Fed. R. Crim. P. 32(i)(4)(A)(ii); *U.S. v. Aquilla*, 976 F.2d 1044, 1054 (7th Cir. 1992).  While pursuant to Federal Rule of Criminal Procedure 32(i)(4)(A)(ii), a criminal defendant must be afforded the opportunity for allocution at some time before the sentence is imposed, the defendant has no right to address the Court again on the actual day on which the sentence is announced.  Fed. R. Crim. P. 32(i)(4)(A)(ii)*; U.S. v. Dabeit*, 231 F.3d 979, 982 (5th Cir. 2000) (holding that it is "unnecessary for a court to renew its invitation for allocution, even when further discussion took place between the [initial] invitation for allocution and the eventual pronouncement of sentencing.").  Even lapses of time greater than a month between the defendant's opportunity to speak and the imposition of sentence do not amount to a denial of the right of allocution.  *U.S. v. Casas-Torrez*, 124 Fed.Appx. 882, 884, 2005 WL 591285, at *2 (5th Cir. 2005) (unpublished opinion) ("Rule 32 ... does not require allocution immediately before sentence is imposed").  Thus, "[i]f the original invitation to speak was comprehensive and readily understandable, it is not necessary for a judge to renew it." *U.S. v. Hernandez*, 291 F.3d 313, 316 (5th Cir. 2002) (internal quotation marks omitted).  Although in *United States v. Rodriguez,* the Fifth Circuit held that it was reversible error for the presiding district court judge to sentence a criminal defendant *in absentia* without another opportunity to be heard by the court, this case is distinguishable because in *Rodriguez* the defendant's first and only opportunity to be heard prior to sentencing was in a hearing presided over by a United States Magistrate Judge.  *Rodriguez,* 23 F.3d 919, 920 (5th Cir. 1994).  Thus, *Rodriguez*, unlike the instant case, involved a unique situation in which Rule 32 was violated because the defendant did not have the opportunity to

the sentence should be filed within ten (10) days from the date of this Order. Thereafter a separate Amended Judgment and Commitment Order will be entered for each Defendant, and the filing of such Amended Judgment and Commitment Order will commence the time to take an appeal. A Defendant who wishes to appeal must file a Notice of Appeal within ten days from the date of filing of the Amended Judgment and Commitment Order containing the sentence as to that Defendant or within ten days after the timely filing of a Notice of Appeal by the Government. Counsel for Defendant should file a Notice of Appeal if Defendant wishes to take an appeal from the Amended Judgment and Commitment Order, or Defendant can cause a Notice of Appeal to be filed by contacting the Clerk of Court and advising the Clerk that Defendant wishes to have a Notice of Appeal filed. The Clerk of Court will then prepare and file the Notice of Appeal. The time limits described in this paragraph apply to the filing of a Notice of Appeal whether filed by counsel for Defendant or by the Clerk of Court. Defendant is entitled to the assistance of counsel if there is an appeal, and if Defendant cannot afford an attorney and is indigent, the Court will appoint an attorney to represent the Defendant on the appeal at no charge or cost to Defendant.

**DONE** and **ORDERED** in Chambers in Orlando, Florida this __29th_____ day of December, 2005.

_____
PATRICIA C. FAWSETT, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

speak before a judge with the authority to impose sentence upon him. *Id*. at 921. Here, both Defendants have had the opportunity to make a statement to the Court, and both availed themselves of that opportunity.

Copies furnished to:

Counsel of Record